UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA,

                              **MEMORANDUM AND ORDER**

        v.                         22-CR-136 (RPK)

ALEXEY GAVINO,

                Defendant.
------------------------------------------------------------x
RACHEL P. KOVNER, United States District Judge:

    A Customs and Border Patrol ("CBP") officer searched a cellular phone belonging to defendant Alexey Gavino during a secondary inspection at John F. Kennedy ("JFK") International Airport and found child pornography.  Gavino now moves to suppress that evidence, along with statements he made to law enforcement officers.  He argues that the warrantless search of his phone at the airport violated his Fourth Amendment right against unreasonable searches.  He also argues that the CBP officer violated his Fifth Amendment right against self-incrimination because the officer did not give *Miranda* warnings and because he compelled the defendant to provide his cell phone passcode.  For the reasons explained below, the motion is denied.

## BACKGROUND

    The following facts, taken from the testimony at the suppression hearing and exhibits submitted by the government and the defendant, were established by a preponderance of the evidence.

    On August 30, 2021, CBP Officer Joseph Sottile was on duty at JFK Airport.  Evidentiary Hearing Tr. ("Tr.") 6:4–5; 23:24–24:1.  Officer Sottile is a member of the Passenger Intelligence Enforcement Response Unit ("PIER") of the CBP.  *Id*. 6:6–14.  Members of PIER focus on combatting narcotics and human trafficking, *id*. 6:21–22, and do so by, among other means, conducting secondary inspections of individuals that are "targeted" for possible inspection, *id*.

6:25–7:6.  Targeted individuals may have "lookouts" placed on them by CBP units or other law enforcement agencies.  *Id*. 8:24–9:4.  A lookout explains the reasons a person is a target and provides a summary of relevant past incidents involving that person.  *Id*. 9:10–13.

During a secondary inspection of a traveler subject to a lookout, officers commonly search the traveler's possessions for contraband and prohibited items, *id*. 10:18–11:3, and engage the traveler in conversation to "get a baseline and see if they're nervous, [if] their [] responses are normal, and make sense," *id*. 11:4–9.  Officer Sottile conducts between 15 to 20 secondary inspections per day.  *Id*. 9:25–10:7.

In Terminal 5 of JFK Airport, such inspections are conducted in an area that adjoins baggage claim and is accessible through a pair of sliding glass doors.  Gov. Exs. 3–4.  The area doubles as the location for Global Entry application interviews.  Gov. Ex. 3.  It has an open-floor plan consisting of several baggage inspection counters, as well as a sizeable waiting area equipped with a television.  Gov. Exs. 5–6.  Multiple civilians can be in the secondary inspection area at any given time, including other passengers, airline workers, and families coming for Global Entry interviews.  Tr. 21:7–21.

On August 30, 2021, the defendant returned to the United States from the Dominican Republic through JFK Airport.  *Id*. 24:10–16.  A few hours before the defendant's plane landed, Officer Sottile reviewed a lookout that had been placed on the defendant.  *Id*. 24:19–24.  The lookout noted that on a 2019 air trip from Dallas to Los Angeles, law enforcement officers seized $37,000 in cash from the defendant's person, and the defendant never attempted to retrieve the cash afterward.  *Id*. 25:4–8, 25:19–26:3.

Officer Sottile met the defendant outside the primary inspection area in Terminal 5.  *Id*. 26:13–16.  Officer Sottile wore plainclothes with his badge hanging visibly around his neck.  *Id*.

2

27:6–15.  He was carrying a firearm, though it was tucked into his clothing and not visible to the defendant.  *Id*. 27:16–23.  Officer Sottile identified himself and informed the defendant that he had been selected for a secondary exam.  *Id*. 26:20–25.  As Officer Sottile accompanied the defendant to the secondary inspection area, he did not show his weapon, tell the defendant he was armed, or place his hands on the defendant.  *Id*. 27:1–2; 27:24–28:2.  The defendant was never told he was under arrest or placed in handcuffs.  *Id*. 29:2–6.  The defendant did not resist.  *Id*. 27:3–5. However, according to Officer Sottile, the defendant was not free to leave at this point.  *Id*. 43:9–11; 45:5–7.

Once in the secondary inspection area, Officer Sottile searched the defendant's bag.  *Id*. 29:10–15.  Officer Sottile did not recall if there were other passengers present in the secondary inspection area at the time.  *Id*. 28:3–6.  And while there were other CBP officers in the area, they were going about their business and did not surround the defendant during his interactions with Officer Sottile.  *Id*. 35:18–25.

While Officer Sottile searched the defendant's bag, he asked the defendant about his trip to the Dominican Republic and about any past incidents where he had been arrested or had anything taken from him.  *Id*. 29:16–22.  While Officer Sottile's demeanor was "calm" and "cordial," the defendant was "[n]ervous."  *Id*. 31:8–16.  When asked whether he ever had anything taken from him, the defendant initially answered "no," *id*. 29:23–24, which Officer Sottile recognized to be contrary to the information provided by the lookout, *id*. 30:23–31:7.  Officer Sottile then asked the defendant whether he ever had money seized from him, at which point the defendant admitted that he had.  *Id*. 29:24–30:1.  The defendant told the officer that he had approximately $30,000 taken from him that he was going to use to buy a dog.  *Id*. 30:2–5.  When asked what kind of dog he was planning to purchase, the defendant at first answered that he did

not know because he was buying the dog on behalf of his friend, *id*. 30:5–8, then later stated that the dog was actually for his friend's brother, *id*. 30:8–10.  And when Officer Sottile asked the defendant to call his friend or his friend's brother, the defendant stated that his friend had died and that he no longer talked to the brother and didn't have his number.  *Id*. 30:14–19.  Officer Sottile ultimately concluded that the defendant's answers were "reluctant" and "didn't make any sense." *Id*. 31:16–20.

At this point, Officer Sottile asked the defendant for his cell phone.  *Id*. 30:21–22.  Officer Sottile stated that he suspected the cash seized from the defendant in 2019 was intended to buy marijuana and "asked him to open the phone so I can verify what I suspected to be true."  *Id*. 32:6–12.  At the same time, Officer Sottile testified, he was looking for potential evidence of the defendant's narcotics trafficking activity from his trip to the Dominican Republic, such as evidence of "large sums of cash and large amounts of narcotics."  *Id*. 37:15–38:1.  Officer Sottile explained that the CBP knows the Dominican Republic as a country from which narcotics are frequently trafficked.  *Id*. 7:10–15; 24:11–14.

The defendant handed his cell phone to Officer Sottile in the powered on, locked position. *Id*. 32:13–18.  When Officer Sottile asked the defendant to unlock the phone, the defendant responded, in sum and substance, "you're the government, you can unlock it yourself, no?"  *Id*. 32:21–23.  Officer Sottile replied that he could, but that he would need to send the defendant's phone to a lab, which could take several months.  *Id*. 32:23–25.  In response, the defendant apologized and unlocked the phone and gave it back to Officer Sottile.  *Id*. 33:1–5.  Officer Sottile also asked the defendant for the phone's passcode, which the defendant provided without protest. *Id*. 33:2–15.

Officer Sottile then placed the phone in airplane mode and conducted a "basic" or "manual" search of the phone, *id*. 33:19–34:2, meaning that he scrolled through the phone without uploading the phone's contents to a computer or attaching any electronic devices to the phone, *id*. 20:12–21. At some point during the manual search, the phone locked, and Officer Sottile used the passcode to unlock the phone. *Id*. 37: 1–14. After around five minutes of searching the phone, *id*. 77:24–78:1, and approximately ten to fifteen minutes from the start of the secondary exam, *id*. 35:5–8, Officer Sottile discovered images of what he believed to be child pornography, *id*. 33:23–34:2. After discovering these images, Officer Sottile contacted both his supervisor and Homeland Security Investigations ("HSI"). *Id*. 34:16–19.

Shortly thereafter, a HSI officer arrived at the secondary inspection area. *Id*. 34:20–22. She conducted a manual search of the defendant's phone, obtained a *Miranda* waiver from the defendant, and proceeded to interview the defendant, who admitted that he had received child pornography on his cell phone. *See* Mot. to Suppress, Ex. A, Aff. in Supp. of App. For Warrant ¶¶ 10–11(Dkt. #22). The HSI officer applied for and obtained a warrant to conduct a forensic search of the phone based on this information. *See id*.; Mot. to Suppress, Ex. A, Search and Seizure Warrant (Dkt. #22).

In March 2022, the defendant was indicted on three counts of transportation of child pornography and one count of possession of child pornography. Indictment ¶¶ 1–2 (Dkt #1). The defendant then filed this instant motion to suppress all evidence obtained from the searches of his cell phone. He argues that Officer Sottile's initial search of his phone at JFK Airport violated the Fourth Amendment, that evidence obtained from that initial search must therefore be suppressed, and that evidence from the later forensic search of the phone and statements the defendant made to law enforcement must be suppressed as fruits of that initial search. *See* Def.'s Br. 6 (Dkt. #22);

Def's Suppl. Br. 5–6 (Dkt. #33).  In addition, the defendant argues that his Fifth Amendment right against self-incrimination was violated because Officer Sottile should have provided *Miranda* warnings before requesting the passcode and that, in any event, the defendant provided the passcode involuntarily.  *Ibid*.  Therefore, he contends, the evidence obtained from the phone searches and his statements should be suppressed as fruits of these Fifth Amendment violations. *Ibid*.

A suppression hearing was held on August 14, 2023, at which Officer Sottile was the sole witness.  *See generally* Evidentiary Hearing Tr.

## DISCUSSION

The motion to suppress is denied because Officer Sottile did not violate the defendant's Fourth Amendment right against unreasonable searches or his Fifth Amendment right against self-incrimination.

## I.   The Search of the Defendant's Cell Phone at the Border Did Not Violate the Fourth Amendment

The search of the defendant's phone at the border was constitutionally permissible, under the Second Circuit's precedent, because it was supported by the reasonable suspicion that this Circuit has found sufficient to justify highly intrusive searches at the border.

Searches of persons and property at the border are a long-recognized exception to the general rule requiring that searches be supported by probable cause and conducted with a warrant. *United States v. Ramsey*, 431 U.S. 606, 619 (1977).  The border exception to these requirements has been justified based on both historical practice, *see ibid.*; *United States v. Flores-Montano*, 541 U.S. 149, 152–53 (2004), and a balancing of the interests that border searches implicate, *see, e.g.*, *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985).

The public interests underlying the border search exception involve controlling "who and what may enter the country," *Ramsey*, 431 U.S. at 620.  The government has a strong interest in "stopping and examining persons and property crossing into this country," *ibid.*, to "prevent[] the entry of unwanted persons and effects," *Flores–Montano*, 541 U.S. at 152.  This interest "is at its zenith at the international border," *ibid.*, of which an airport customs area is the functional equivalent, *United States* v. *Levy*, 803 F.3d 120, 122 (2d Cir. 2015).  Conversely, because "travelers understand that they subject themselves and their property to some form of search by crossing international boundaries," *United States v. Aigbekaen*, 943 F.3d 713, 727 (4th Cir. 2019) (Richardson, J., concurring), the Supreme Court has "on many occasions" explained "that the expectation of privacy is less at the border than it is in the interior," *Flores-Montano*, 541 U.S. at 154. What's more, "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border." *Montoya de Hernandez*, 473 U.S. at 540.

This balance of public and private interests is reflected in two rules.  First, customs officers may conduct "routine" searches of persons or property at the border without a warrant or any level of suspicion that criminal activity is afoot.  *Id.* at 538.  Second, customs officers may conduct border searches that impinge significantly on privacy or dignitary interests when they have reasonable suspicion of criminal activity.  *United States v. Irving*, 452 F.3d 110, 123–24 (2d Cir. 2006) ("[M]ore invasive searches, like strip searches, require reasonable suspicion."); *see United States v. Ogberaha*, 771 F.2d 655, 658 (2d Cir. 1985) (body cavity search); *United States v. Asbury*, 586 F.2d 973, 976 (2d Cir. 1978) (strip search); *see also Montoya de Hernandez*, 473 U.S. at 541–42 (requiring reasonable suspicion for detention of traveler overnight for purpose of monitored bowel movement).

7

*Riley v. California*, 573 U.S. 373 (2014), indicates that searches of cell phones fall within the second category of more intrusive searches.  In *Riley*, the Court addressed whether cell phones may be searched incident to an arrest, based on the general Fourth Amendment principle that officers making a lawful arrest may search the arrestee and immediately associated physical property without a warrant or probable cause.  *Id*. at 378.  The *Riley* Court held that this exception to the Fourth Amendment's warrant requirement ought not to extend to cell phones, based on an analysis of the governmental and private interests at stake.  *Id*. at 385–86.  As to governmental interests, the interests in preventing "harm to officers and destruction of evidence" that underlie the ordinary search-incident-to-arrest exception did not "ha[ve] much force with respect to digital content on cell phones," because "digital data" did not present "comparable risks" with respect to either harm.  *Id*. at 386.  And as to private interests, cell phones implicated far greater privacy concerns than "other objects that might be kept on an arrestee's person," because they are pervasively used to carry a vastly greater quantity of data than other devices, and because the data they carry is often sensitive.  *Id*. at 393–94.  Because cell phones differ from other objects in "both a quantitative and a qualitative sense," *id*. at 375, the *Riley* Court stated, treating them as indistinguishable from other forms of property is "like saying a ride on horseback is materially indistinguishable from a flight to the moon," *id*. at 393.

*Riley*'s discussion of privacy interests establishes that searches of cell phones should be treated as intrusive border searches, rather than standard ones.  The government resists this conclusion, emphasizing that searches, like the one here, in which an officer "manually traverses the contents of the traveler's cell phone," *Alasaad v. Mayorkas*, 988 F.3d 8, 18 (1st Cir. 2021), are not as intrusive as forensic searches in which an officer uses another device to "review, copy and/or analyze" the phone's contents, *id.* at 13 & n.3; *see* Gov't Br. 15 (Dkt. #25).  But while manual

searches are likely to be less intrusive than forensic ones, *Riley*'s discussion of privacy interests drew no distinctions based on the method of search. Indeed, the searches that the Court recognized as significant intrusions in *Riley* were manual ones. *See United States v. Wurie*, 728 F.3d 1, 2 (1st Cir. 2013), *aff'd sub nom. Riley v. California*, 573 U.S. 373 (2014); *People v. Riley*, 2013 WL 475242, at *3 (Cal. Ct. App. Feb. 8, 2013), *rev'd and remanded sub nom. Riley v. California*, 573 U.S. 373 (2014). *Riley* thus establishes that even manual cell phone searches are intrusive. The Fourth Amendment principles governing intrusive border searches therefore require law enforcement officers to have reasonable suspicion of criminal activity in order to search a traveler's cell phone.

Contrary to the defendant's arguments, though, neither *Riley* nor any other case supports requiring more than reasonable suspicion for cell phone searches at the border. Whereas *Riley* observed that warrantless searches of arrestees' cell phones incident to arrest did not meaningfully advance governmental interests in protecting officer safety and preventing the destruction of evidence—the interests underlying the search-incident-to-arrest rule—*Riley* did not do the same with respect to the distinct interests underlying border searches. In fact, cell phone searches transparently advance the public interest in "preventing the entry of unwanted persons and effects," which the Supreme Court has described as at the heart of the border-search rule. *Flores-Montano*, 541 U.S. at 152. A cell phone search may reveal contraband directly, as it apparently did in this case, where the customs officer uncovered child pornography. Communications, documents, or images on a phone may also reveal that a traveler is carrying drugs, weapons, or other contraband, *cf. Montoya de Hernandez*, 473 U.S. at 544 (recognizing customs and immigration officials are charged with "protecting this Nation from entrants who may bring anything harmful into this country, whether that be communicable diseases, narcotics, or explosives"), or that the traveler

should not be admitted for other reasons, including because he is not who he claims to be; because he is inadmissible on immigration grounds; or because the traveler presents a national security threat.

And *Riley*'s analysis of the intrusiveness of cell phone searches does not justify requiring more than reasonable suspicion for a cell phone search conducted at the border, because, as noted above, "courts consistently have deemed reasonable suspicion sufficient to justify even the most intrusive of nonroutine border searches, including body cavity and alimentary canal searches," *United States v. Kolsuz*, 890 F.3d 133, 141 (4th Cir. 2018); *see Irving*, 452 F.3d at 123–24. *Riley* does not suggest that cell phone searches intrude more greatly on privacy or dignity than strip searches, alimentary canal searches, or the like. In fact, past decisions have suggested that searches of the body intrude more significantly than searches of property. *See Flores-Montano*, 541 U.S. at 152; *Aigbekaen*, 943 F.3d at 728 (Richardson, J., concurring); *United States v. Touset*, 890 F.3d 1227, 1233 (11th Cir. 2018). Moreover, a person headed abroad can leave behind a cell phone or curate its contents, even if doing so is inconvenient; a traveler seeking to avoid an intrusive body search has no comparable choice. See *Touset*, 890 F.3d at 1235. It is therefore unsurprising that no appellate court has required a greater quantum of suspicion for cell phone searches at the border than the reasonable suspicion that suffices for sensitive searches of travelers' bodies. *See United States v. Cano*, 934 F.3d 1002, 1015–16 (9th Cir. 2019) ("[P]ost-*Riley*, no court has required more than reasonable suspicion to justify even an intrusive border search.").

Beyond *Riley*, the defendant points to a pair of recent out-of-circuit cases placing substantive limits on border searches of cell phones. In the case of potentially greatest use to the defendant, the Ninth Circuit concluded that "border searches are limited in both purpose and scope to searches for contraband," *id.* at 1016, and that officers may therefore search cell phones "for

contraband only"—such as images of child pornography—but not for "evidence of border-related crimes," *id.* at 1017, or "evidence of contraband that is not present at the border," *id.* at 1018 (emphasis omitted).  The Fourth Circuit has imposed more modest substantive limits—holding that warrantless forensic searches of cell phones at the border require reasonable suspicion "of an offense that bears some nexus to the border search exception's purposes of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband." *Aigbekaen,* 943 F.3d at 721 (citing *Kolsuz*, 890 F.3d at 143).

These out-of-circuit cases cannot help the defendant, though, because the Second Circuit has adopted a broader view of border searches.  The Second Circuit considered whether such searches must be closely connected to contraband or to border-related offenses in *Levy, supra*. There, the defendant argued that customs officers violated the Fourth Amendment by inspecting and copying pages from his notebook based on suspicion of the defendant's participation in illegal stock manipulation schemes. *Levy*, 803 F.3d at 121–23.  The Second Circuit disagreed—rejecting the defendant's position that border searches should be limited to crimes that "statute or regulation specifically authorizes [customs officers] to investigate." *Id.* at 124.  Instead, it held that customs officers "have the authority to search and review a traveler's documents and other items at the border when they reasonably suspect that the traveler is engaged in criminal activity, even if the crime falls outside the primary scope of their official duties." *Ibid*.  Accordingly, it concluded, even if the inspection and copying of the defendant's papers had amounted to a nonroutine border search, the search was permissible because it was supported by reasonable suspicion of criminal activity. *Id.* at 122–23.  *Levy* thus forecloses the Ninth Circuit's position that "border searches are limited in both purpose and scope to searches for contraband," *Cano,* 934 F.3d at 1016, and the Fourth Circuit's position that they must bear a "nexus to the border search exception's purposes

11

of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband," *Aigbekaen,* 943 U.S. at 721.

For similar reasons, I am not persuaded by a recent district court case requiring a warrant and probable cause for a cell phone search at the border. *United States v. Smith,* -- F. Supp. 3d --, No. 22-CR-352 (JSR), 2023 WL 3358357 (S.D.N.Y. 2023). To reach that conclusion, that court dismissed the government's interests in such searches as "relatively weak" on the theory that digital contraband can easily be transmitted into the United States electronically. *Id.* at *8. But searches of electronic devices at the border have value not just in detecting contraband itself on a device but in determining whether a traveler is carrying drugs or other dangerous or illegal items, as well as whether a traveler ought not to be admitted for national security, immigration or other reasons, as explained above. Invoking the Ninth Circuit's decision in *Cano*, the *Smith* court suggests these interests are not legitimate. *See id.* at *9 (stating that just as a general interest in detecting crime "cannot support the Government's conducting a warrantless search of a person's house simply because it believes it may contain evidence of a crime, it does not support allowing the Government to conduct warrantless searches of cell phones for evidence of border-related crimes") (citing *Cano*, 934 F.3d at 1018). But that view, again, does not seem compatible with the relatively expansive approach to border searches articulated by the Second Circuit in *Levy*—a case that *Smith* does not discuss in the relevant section. As noted above, *Levy* rejects cabining border searches to detecting contraband itself—as the Ninth Circuit, alone among federal courts of appeals, has done. *See* pp.10–11, *supra.*

Beyond this, the *Smith* court argues that the extent of the privacy intrusion involved in a cell phone search forecloses warrantless searches of cell phones at the border, arguing that "the magnitude of the privacy invasion caused by such searches dwarfs that historically posed by border

12

searches." *Smith*, 2023 WL 3358357 at *7. But as noted above, the courts of appeals and to some extent the Supreme Court have in fact considered highly intrusive border searches before. *See* p. 7, *supra*. Balancing governmental and individual interests in cases involving exceptionally strong privacy interests—such as cases involving strip searches and body-cavity searches—the Second Circuit and other courts of appeals have held that such searches are permissible when supported by reasonable suspicion of criminal activity. *Ibid.* The *Smith* court does not explain why a cell phone search—while no doubt sensitive—should be treated as more intrusive than strip searches, alimentary canal searches, or the other intrusive searches for which reasonable suspicion has long been treated as striking the appropriate balance of interests. In sum, in the Second Circuit, reasonable suspicion of criminal activity suffices to justify a cell-phone border search.

Here, Officer Sottile had reasonable suspicion that the defendant was involved in criminal activity. "Reasonable suspicion requires only 'a particularized and objective basis for suspecting the particular person stopped of criminal activity,'" based on the totality of the circumstances. *Levy*, 803 F.3d at 123 (quoting *Navarette v. California*, 572 U.S. 393, 396 (2014)). It therefore requires "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Ibid.* (quoting *Navarette*, 572 U.S. at 397). In making this objective determination, courts consider factors such as "unusual conduct of the defendant, . . . computerized information showing propensity to commit relevant crimes, or a suspicious itinerary." *Irving*, 452 F.3d at 124 (citing *United States v. Asbury*, 586 F.2d at 976).

The reasonable suspicion standard is readily satisfied here. When questioned by Officer Sottile at the border, the defendant appeared nervous, Tr. 31:14–16, and he lied about his prior travels in a manner suggesting that he was seeking to avoid further scrutiny of his entry—claiming that he had not previously had items confiscated from him when in fact he had, *id*. 29:20–30:1,

13

30:23–31:7.  His answers to Officer Sottile's questions were "reluctant" and "didn't make any sense."  *Id*. 30:2–19; 31:16–19.  Setting aside the defendant's dishonesty, that past seizure contributed to reasonable suspicion because traveling with $37,000 in cash on his person, which was seized but never retrieved, was behavior consistent with narcotics trafficking.  *Id*. 25:5–26:3.  Finally, on the day of the search, the defendant was traveling to the United States from the Dominican Republic—which the CBP knows as a location from which drugs are frequently smuggled.  *Id*. 7:10–15; 24:11–13.  Those facts, taken together, provided a particularized and objective basis for suspecting that the defendant was engaged in narcotics trafficking when he attempted to reenter the United States.  Accordingly, Officer Sottile had the reasonable suspicion needed to support a search of the defendant's cell phone at the border.

**II.    Officer Sottile Did Not Violate the Defendant's Right Against Self-Incrimination**

The defendant's motion to suppress the evidence recovered from his cell phone and statements he made to law enforcement as the product of un-*Mirandized* or compelled testimony is also denied.  Even setting aside the question of whether providing a cell phone passcode is a testimonial act, no violation of *Miranda* or the Fifth Amendment occurred.  Contrary to the defendant's contentions, Officer Sottile was not required to provide the defendant *Miranda* warnings before requesting his phone's passcode because the defendant was not in custody when he was questioned.  And no Fifth Amendment violation occurred because the defendant provided his passcode voluntarily.  Since no violation of *Miranda* or the Fifth Amendment occurred, the defendant's motion to suppress the cell-phone evidence and his statements as fruits of those asserted violations is denied.

14

### A. *Miranda* Warnings Were Not Required Because the Defendant Was Not in Custody

Officer Sottile did not violate the defendant's constitutional rights by questioning him about his cell phone passcode and other topics without first providing *Miranda* warnings.  As a "prophylactic" measure to safeguard the Fifth Amendment rights against self-incrimination, *Vega v. Tekoh*, 597 U.S. 134, 134–35 (2022) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)), the Supreme Court has required *Miranda* warnings when "suspects who are in custody are interrogated" by law enforcement officers," *id.* at 141; *see United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011).  Whether an individual is in custody depends on "whether a reasonable [person] in the suspect's position would have understood [him]self to be subjected to restraints comparable to those associated with a formal arrest."  *FNU LNU*, 653 F.3d at 153 (internal quotation marks omitted) (quoting *Georgison v. Donelli*, 588 F.3d 145, 155 (2d Cir. 2009)); *see Berkemer v. McCarty*, 468 U.S. 420, 422 (1984).  The fact that a person is not free to leave, standing alone, is not enough to establish that the person is in custody for purposes of *Miranda*. *FNU LNU*, 653 F.3d at 152–153.

The Second Circuit has set forth a non-exhaustive list of factors relevant to whether a reasonable person would understand himself to be in custody, including:

- "the interrogation's duration";
- "its location (*e.g.*, at the suspect's home, in public, in a police station, or at the border)";
- "whether the suspect volunteered for the interview";
- "whether the officers used restraints";
- "whether weapons were present and especially whether they were drawn";
- "whether officers told the suspect he was free to leave or under suspicion"; and
- "especially so in border situations, the nature of the questions asked."

*Id.* at 153.  "A reasonable person's expectations about how the questioning is likely to unfold are also relevant."  *Ibid.*  Accordingly, the fact that a reasonable person "expects both constraints and

questions" when arriving at an American airport "reduces the likelihood that reasonable persons" facing questioning at the airport "would consider themselves to be under arrest." *Id*. at 154.

Indeed, courts have consistently held that secondary inspections at airports are not custodial even when they involve meaningful constraints on travelers' freedoms. In *FNU LNU* itself, the Second Circuit found that a traveler was not in custody even though she was escorted by armed guards to a closed room, out of public view, and was fingerprinted and interrogated there for 90 minutes, without being free to go. 653 F.3d at 155. Because officers never drew their weapons, did not physically restrain the traveler, and asked questions relevant to her admissibility, the Second Circuit concluded that "a reasonable person in the defendant's position would not have considered what occurred to be the equivalent of a formal arrest." *Ibid.* District courts have similarly found secondary inspections non-custodial even when several *FNU LNU* factors pointed in the opposite direction. *See, e.g.*, *United States v. Booth*, 583 F. Supp. 3d 545, 552 (S.D.N.Y. 2022) (finding that the defendant was not in custody even though he was asked questions in a closed room out of public view that were "clearly motivated by the pending criminal investigation, not immigration concerns," when questioning lasted ten minutes and the traveler was never restrained); *United States v. Wilson*, 100 F. Supp. 3d 268, 278–79 (E.D.N.Y. 2015) (holding that the defendant was not in custody even though he had been grabbed by an officer and removed from the public screening area to a private screening room, was patted down, and directed to sit on a bench with his back to the wall); *United States v. Rijo-Carrion*, No. 11-CR-784 (RRM), 2012 WL 6617388, at *3 (E.D.N.Y. Dec. 19, 2012) (finding the defendant was not in custody even though he was "certainly not free to leave").

Here, most of the *FNU LNU* factors indicate that the defendant was not in custody when Officer Sottile questioned him. The questioning took place in the secondary inspection area, which

was accessible to other civilians through a pair of glass sliding doors.  Tr. 21:7–21; Gov. Exs. 3–4.  While other CBP officers were in the vicinity, they were going about their own business.  Tr. 35:18–25.  From the start of the encounter to when Officer Sottile discovered what appeared to be child pornography, Officer Sottile never showed his weapon, restrained the defendant in any way, or told the defendant he was armed or that the defendant was under arrest.  *Id.* 27:1–2; 27:24–28:2; 29:2–26.  And Officer Sottile's questions focused on the defendant's past travel, which "fall[s] within the range of inquiries one expects" at the border, *FNU LNU*, 653 F.3d at 154.  While the defendant was not free to leave the secondary inspection area, that factor by itself does not render Officer Sottile's questioning custodial.  *See ibid.* (finding the defendant was not in custody even though she was not free to leave).  Considering the totality of the circumstances, the defendant was subjected to "nothing more than the conditions typical of a modern border inspection," *Rijo-Carrion*, 2012 WL 6617388, at *3, and was not in custody.

In arguing to the contrary, the defendant relies on cases bearing little resemblance to this case, in that they involve conduct substantially more overbearing than that involved in a routine secondary inspection.  In *United States v. Carr*, 63 F. Supp. 3d 226, 236 (E.D.N.Y. 2014), a court found that the defendant had been questioned in custody in part because the defendant had been "physically removed from the public screening area" by four officers, two of whom had both hands on the defendant, before questioning in a "private pat-down room" where "three of the four officers who escorted him into the room surrounded him."  In *United States v. Morla*, 123 F. Supp. 3d 382 (E.D.N.Y. 2015), the court placed great reliance on the fact that a traveler was handcuffed while being transported to the interrogation room and was then handcuffed to a bench during questioning by three agents.  *Id.* at 387 (stating that '[h]andcuffs are generally recognized as a hallmark of a formal arrest'" and emphasizing that "[t]he government has not cited to—and the Court has not

17

found—any case in which handcuffs were used in the present manner and the defendant was held not to be in custody for *Miranda* purposes"). And in *United States v. Djibo*, 151 F. Supp. 3d 297, 306 (E.D.N.Y. 2015), the court placed heavy reliance on the involvement of an HSI agent (in addition to CBP officers), and on the court's conclusion that the questioning exceeded the scope of an ordinary border inspection—for example by asking an *outbound* traveler "to execute an inbound passenger customs declaration form." In this case, which presents no analogous circumstances, the defendant was not in custody when questioned by Officer Sottile. *Miranda* warnings were not required.

### B.  The Defendant Was Not Compelled To Make Incriminating Statements

The defendant is also not entitled to suppression on the theory that the evidence seized from his cell phone was the fruit of an involuntary statement—namely, his statement providing Officer Sottile with his cell phone passcode. Even non-custodial statements to law enforcement officers violate the Fifth Amendment when they are not "voluntary, *i.e.*, the product of an essentially free and unconstrained choice by [their] maker." *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) (internal quotation marks and citation omitted). A statement is involuntary if, "considering the totality of the circumstances, the free will of the [person making the statement] was overborne." *United States v. Washington*, 431 U.S. 181, 188 (1977); *see United States v. Kourani*, 6 F.4th 345, 351 (2d Cir. 2021).

In evaluating the totality of circumstances, courts consider "(1) the characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of law enforcement officials." *Haak*, 884 F.3d at 409 (quoting *Green v. Scully*, 850 F.2d 894, 901–02 (2d Cir. 1988)). The relevant characteristics of the individual include his "experience and background, together with [his] youth and lack of education or intelligence." *Green*, 850 F.2d at 902 (citation omitted). "[T]he conditions under which a suspect is questioned" include "the place where an interrogation

is held, and the length of detention . . . [and] [t]he presence or absence of counsel." *Ibid*. Factors bearing on law enforcement officials' conduct—the "most critical circumstance"—"include the repeated and prolonged nature of the questioning or the failure to inform the accused of his constitutional rights, whether there was physical mistreatment such as beatings, or long restraint in handcuffs, and whether other physical deprivations occurred such as depriving an accused of food, water or sleep, or even of clothing for a prolonged period." *Ibid*. In addition, courts consider whether law enforcement used "psychologically coercive techniques such as brainwashing or promises of leniency or other benefits." *Ibid*.

Based on the totality of circumstances, the defendant's proffer of his cell phone passcode was voluntary. As to the defendant's characteristics, Officer Sottile testified that the defendant appeared to understand his questions, spoke English well, and seemed to understand what was going on. Tr. 31:22–32:5. Second, as discussed above, the questioning occurred in circumstances akin to a run-of-the-mill secondary inspection—around ten to fifteen minutes of questioning in a publicly accessible area. *See* p. 17, *supra*. Finally, Officer Sottile's interactions with the defendant were "calm" and "cordial," *id*. 31:8–16, without hallmarks of coercion.

Contrary to the defendant's contentions, Officer Sottile did not engage in coercive conduct by "threat[ening] to deprive Mr. Gavino of his property," Def.'s Suppl. Br. 8—an apparent reference to Officer Sottile's statement that while he could unlock the defendant's phone without the passcode, doing so would require "send[ing] [the phone] to a lab and [the defendant] might not get it back for several months," *id*. 32:23–25. To be sure, some courts have held that unfounded threats can undermine voluntariness—albeit in assessing consent under the Fourth Amendment, not voluntariness of statements under the Fifth Amendment. *See United States v. Munoz*, 987 F. Supp. 2d 438, 446 (S.D.N.Y. 2013) (addressing "highly misleading" statement implying officer

could obtain warrant though officers knew they lacked a basis to do so); *United States v. Eggers*, 21 F. Supp. 2d 261, 270 n.81 (S.D.N.Y. 1998) (addressing threat to obtain warrant when agents lacked well-founded belief that they could obtain one).  But no impermissible coercion occurs unless the officer's statement is actually unfounded.  *See Henry v. Tracy*, 629 F. App'x 26, 28 (2d Cir. 2015) ("We have repeatedly held . . . that it is not impermissibly coercive for officers to represent that, if consent is not given, a search warrant could be obtained, in contexts . . . in which the obtainability of a search warrant is in fact likely."); *see also United States v. Yu-Leung*, 51 F.3d 1116, 1119 (2d Cir. 1995) (affirming decision finding consent to search home was voluntary even though officers represented that they would "remain [in the home] indefinitely pending the availability of a search warrant" in the absence of consent); *United States v. Hawthorne*, 982 F.2d 1186, 1191 (8th Cir. 1992) (rejecting claim that consent to search was involuntary because of officer's truthful statement that dog sniff would be conducted absent consent); *United States v. Taylor*, No. 97-CR-787 (MBM), 1998 WL 75689, at *6 (S.D.N.Y. Feb. 23, 1998) (same).

Here, Officer Sottile made no unfounded threat.  Even if Officer Sottile's statements were construed as a threatened future action—rather than merely an answer to the defendant's question about his agency's technological capabilities—Officer Sottile made clear that he would in fact have sent the defendant's phone to a lab if he were unable to access its contents.  Tr. 66:19–67:9. And the defendant has made no argument as to why doing so would have been legally improper, beyond the Fourth Amendment challenge discussed and rejected above.  *See* pp. 6–14, *supra*.

In sum, the defendant provided his passcode voluntarily.  Accordingly, the defendant's motion to suppress evidence obtained from his phone and statements he made as fruits of a Fifth Amendment violation is denied.

**CONCLUSION**

For the foregoing reasons, the motion to suppress is denied.

SO ORDERED.

_/s/ Rachel Kovner_
RACHEL P. KOVNER
United States District Judge

Dated: January 7, 2024
       Brooklyn, New York

21